UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

ELVIS CESAR MEDRANO,                    )
                                        )
                Plaintiff,              )
                                        )
        v.                              )        No. 3:20-cv-00251-RLY-CSW
                                        )
BRANDON GARLAND, *et al.*,              )
                                        )
                Defendants.             )

**ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

In August 2020, officers of the Washington Police Department and the Daviess
County Sheriff's Department reported to a residence at 600 Front Street, Washington,
Indiana, to arrest Plaintiff Elvis Cesar Medrano.  After Medrano did not exit from the
residence upon officers' orders, officers used tear gas to extract Medrano from the
building and arrest him.  Medrano sues Officers Brandon Garland, Kane Waggoner, Greg
Dietch, Aaron Guzman, and Tyler Holcomb of the Washington Police Department; and
Jay R. Crew and Keith Hinderliter of the Daviess County Sheriff's Department.  Medrano
asserts claims under § 1983 for excessive force, failure to intervene, and failure to render
medical aid in violation of the Fourth Amendment.  Defendants move for summary
judgment pursuant to Federal Rule of Civil Procedure 56.  Medrano cross-moves for
summary judgment.  For the reasons set forth below, the court **GRANTS** Defendants'
motion and **DENIES** Medrano's motion.

1

I.    **Background**

On June 25, 2020, an arrest warrant was issued for Medrano in Sullivan Superior Court for dealing methamphetamine among other charges.  (Filing No. 110-11, Medrano Warrants at 3).  Medrano was also wanted on a "[p]arole warrant out of Iowa for a previous charge of Conspiracy or Possession with Intent to Distribute Methamphetamine."  (Filing No. 110-23, Washington Police Report at 13).  On July 7, 2020, Medrano fled from law enforcement in a vehicle from a motel in Daviess County.  (Medrano Warrants at 3; Filing No. 110-25, SRU After Action Report at 9).  Before Medrano entered his vehicle to flee, Garland observed what he believed was a handgun in Medrano's waistband.  (Medrano Warrants at 3).  In a subsequent search of Medrano's motel room, officers found ammunition and a gun cleaning kit.  (*Id.*).

On August 3, 2020, Garland observed who he believed was Medrano enter the residence at 600 Front Street, Washington, Indiana.[1]  (*Id.*).  Garland requested that the Daviess County Sheriff's Department's Special Response Unit ("SRU") assist the Washington Police Department Emergency Response Team ("ERT") in arresting Medrano at 600 Front Street.  (SRU After Action Report at 9).  Officers arrived at the scene around 3:45 p.m. and formed a perimeter around the residence.  (*Id.*; Filing No. 115, Pole Camera Video at 2:28:42).  Upon officers' arrival, three individuals were outside the residence: Jack Aishe, Tammy Taylor, and Robbie Drew.  (Washington

---

[1] 600 Front Street is a home with an attached trailer.  (Medrano Warrants at 2).  The court refers collectively to the combined structures as the residence.  The residence in its entirety is 420 square feet.  (Filing No. 110-27, Medrano Dep. at 24–25).

Police Report at 13–14). Another individual, Trudy Godfrey, quickly exited the residence almost immediately after officers arrived. (*Id.* at 14). Medrano, however, did not. (*Id.*). The four individuals were detained. (*Id.*). Godfrey confirmed that Medrano was in the residence. (*Id.*).

Medrano testified in his deposition that he was passed out after taking Suboxone and was unable to respond to officers. (Filing No. 110-27, Medrano Dep. at 11–13). Godfrey told Holcomb that Medrano "kept falling asleep. He had Suboxone." (Filing No. 111, Holcomb Bodycam at 23:25). While at the scene, various officers exclaimed at different points that they observed movement in the residence. (*See* Filing No. 111, Garland Bodycam at 7:23 ("He went running to the back."); *id.* at 7:36 ("Movement at the window!"); *id.* at 8:05 ("He shut the front door!"); Filing No. 115, Christie Bodycam at 35:48 ("He's right here at this front corner window."); *id.* at 39:56 ("Window on this side on the front keeps moving the curtain at the bottom."); Filing No. 111, Waggoner Bodycam at 1:15:23 ("It looks like he's putting a board up on that window in there.")). In the SRU After Action Report, Crew wrote that, upon arrival at the scene, he "could hear a subject running to the rear (east end) of the trailer and there was also some furniture being moved" and that "several units witness[ed] on multiple occasions a person inside the residence who kept picking [sic] out the front west window thru [sic] the window blinds." (SRU After Action Report at 9–10).

After Medrano did not exit the residence, Officer Humphries began making repeated announcements over the loudspeaker asking Medrano to exit the residence with his hands in the air. (*Id.*; *see, e.g.*, Filing No. 115, Humphries Bodycam at 2:28). When

3

Medrano still did not exit, officers began discussing the possibility of using tear gas and an officer asked Garland to obtain a warrant.  (SRU After Action Report at 10; Garland Bodycam at 8:17).  Garland then went to his car to obtain a search warrant for 600 Front Street and sent it to the prosecutor for signature.  (Garland Bodycam at 21:50).

Well before officers began using tear gas, another officer told Officer Christie, "They say they have no guns in there."  (Christie Bodycam at 7:15).  Garland told someone on the phone that "they said he does not have a gun right now and that he was recently asking [Godfrey] . . . if she knew where to get one is what she's saying.  But he does have access to a chainsaw she said."  (Filing No. 111, Guzman Bodycam at 20:41).  Garland then told officers over the radio that Godfrey "is claiming she does not think [Medrano] has a firearm, but he was asking about one, but she did not see one."  (Garland Bodycam at 27:00).  Later, after tear gas deployment had begun, Garland remarked, "I don't think he has a gun.  I think if he did—they said he didn't and—I think he'd be shooting by now if he did."  (*Id.* at 1:16:26).

While waiting for the warrant, officers attempted to use a robot, operated by Humphries, to open the front door of the residence and gain entry.  (SRU After Action Report at 10; Humphries Bodycam at 40:25).  The robot "was having a hard time with the aluminum metal screen door and step under it."  (SRU After Action Report at 10).  Crew decided that the glass in the front door had to be broken so the robot could get a better grip on the door.  (*Id.*).  When it was announced over the radio that they were going to

fire a sponge round[2] at the window in the door, Garland said over the radio, "Just to be clear, a warrant has not been signed by the judge yet." (Garland Bodycam at 57:40). The initial officer responded, "Yeah, I'm clear." (*Id.* at 57:57). Crew then fired a 40mm sponge round into the glass and shattered it. (SRU After Action Report at 10; Garland Bodycam 58:02). The robot still could not gain entry into the residence. (SRU After Action Report at 10).

Shortly thereafter, Judge Sobecki signed the search warrant. (Medrano Warrants at 1; Garland Bodycam at 1:05:10). After the warrant was signed, Crew began deploying OS gas, a chemical munition, into the residence. (SRU After Action Report at 10). The first round "went high and flew over the trailer." (*Id.*). The second round misfired. (*Id.*). Crew deployed a third round, which went through a window into the residence. (*Id.*). The fourth round misfired. (*Id.*). Crew then fired two 40mm sponge rounds into two other windows and fired the fifth and sixth rounds of OS gas in each window. (*Id.*). In total, three rounds of tear gas were successfully deployed in the residence.

Medrano exited the residence from the back door less than eight minutes after Crew fired the first round of tear gas that went over the residence. (Garland Bodycam at 1:12:55, 1:20:40). He used a bottle of Mountain Dew to flush the tear gas out of his eyes. (SRU After Action Report at 10). Officers handcuffed Medrano and escorted him to the ERT van. (*Id.*; Garland Bodycam at 1:21:20). Officers patted Medrano down. (Garland Bodycam at 1:21:53). Medrano was then hosed down with water. (*Id.* at 1:23:29).

---

[2] A sponge round is an object used to break windows. (Filing No. 116, Defs.' Resp. Br. at 6).

Defendants' expert witness, Dr. Roy G. Taylor, opined in his report that Medrano was exposed to tear gas for approximately nine minutes. (Filing No. 110-21, Taylor Report at 5). Medrano exited the residence about seventy-five minutes after officers surrounded the house. (*See* Garland Bodycam at 3:15, 1:20:40).

After he was hosed off, Officer Hudson asked Medrano, "You alright?" and Medrano responded, "Yeah." (Filing No. 111, Hudson Bodycam at 5:35). A minute later, Garland asked Medrano, "You hurt anywhere? You alright?" to which Medrano responded, "I'm good, man." (Garland Bodycam at 1:25:14). Another minute later, Garland asked Medrano if he needed water, and Medrano nodded his head yes. (*Id.* at 1:26:05). Two minutes later, an officer asked Medrano if he wanted more water and, after Medrano said yes, provided him with a drink of water. (*Id.* at 1:28:49). The officer again asked Medrano if he wanted more and provided him more water after he said yes. (*Id.* at 1:28:59). The officer asked again if Medrano wanted more water, to which Medrano responded, "No, I'm good man." (*Id.* at 1:29:48). The officer confirmed by asking, "Good?" and Medrano responded, "Yeah." (*Id.*). Garland then remarked that the tear gas "clears out pretty quick" and asked Medrano, "Has it cleared out of you yet?" and specified he was referring to "the burning sensation." (*Id.*). Medrano responded, "Oh yeah." (*Id.*). Two minutes later, Garland informed dispatch over the radio that "EMS, I believe, can disregard." (*Id.* at 1:31:45). A different officer walked by with bottles of water, and Garland told him, "I think [Medrano] got one already. I think he's good." (*Id.* at 1:32:30). Medrano did not request medical assistance at any point on the bodycam footage. (*See* Medrano Dep. at 52).

Medrano points out that the tear gas was strong enough that officers outside the residence were affected by it.  For example, Garland said, "I can't breathe.  Ugh." and started coughing.  (Garland Bodycam at 1:23:00).  He also remarked to Medrano that the tear gas "ain't no joke.  I wasn't even in there!  How'd you do it?"  (*Id.* at 1:24:43).  Garland also said that he was having trouble reading Medrano his rights from a "Miranda card" because his eyes were blurry.  (*Id.* at 1:26:27).  Humphries exclaimed, "Oh, I smell it!  Shit!  Oh boy.  Ooh shit.  That's tangy.  That's tangy."  (Humphries Bodycam at 1:18:10).  Officers coughed and moved further away from the house.  (*Id.* at 1:20:10; Christie Bodycam at 1:15:00).  Humphries talked about how the gas was "still pouring out of" the residence and that it burned and stung.  (Humphries Bodycam at 1:24:40).  Additionally, bodycam footage showed officers drinking water and Gatorade and pouring water on themselves.  (*Id.* at 1:23:25; Garland Bodycam at 1:26:05, 1:27:20).

By the time of his deposition, Medrano had not received any confirmation from any doctors that he had suffered significant or permanent injury from the exposure to tear gas.  (Medrano Dep. at 55, 66).  At Anderson County Detention Center, x-rays were taken of his lungs to assess whether he had scar tissue from the tear gas, but the U.S. Marshals never approved him to see a specialist that could interpret the x-rays.  (*Id.* at 52, 54–55).  Medrano had a "tic" and problems with his eyesight that he "might have obtained" from exposure to tear gas, but the doctor he saw told him they were just side effects of the tear gas and that they should go away.  (*Id.* at 66–67).  However, three years later, Medrano was still experiencing the same lung and eyesight problems.  (*Id.* at 67).

Medrano later filed this suit.  He asserts his excessive force claim against Crew,

his failure to intervene claim against the remaining officer defendants, and his failure to render medical aid claim against all defendants.  (Filing No. 19, Screening Order at 4–5).

## II.     Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court "view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).  When reviewing cross-motions for summary judgment, the court views "all facts and inferences in the light most favorable to the nonmoving party on each motion."  *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015).

## III.    Discussion

Defendants invoke qualified immunity on all of Medrano's claims.  "Qualified immunity shields government actors from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware."  *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011) (internal quotation marks omitted).  Police officers "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at

the time." *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1044 (7th Cir. 2023) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)).  "If *either* inquiry is answered in the negative," the officer "is entitled to summary judgment." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014).  "Courts are free 'to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 926 (7th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Once a defendant raises the affirmative defense of qualified immunity, the plaintiff bears the burden of "defeat[ing] it." *Smith v. Finkley*, 10 F. 4th 725, 737 (7th Cir. 2021). A plaintiff can demonstrate that a "right was clearly established by presenting a closely analogous case that establishes that the [d]efendants' conduct was unconstitutional or by presenting evidence that the [d]efendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Est. of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010) (citing *Hope v. Pelzer*, 536 U.S. 730, 739–40 (2002)).

The court first discusses whether Crew is entitled to qualified immunity from Medrano's excessive force claim.  The court then addresses whether the remaining defendants have qualified immunity with respect to Medrano's failure to intervene claim. Lastly, the court considers whether Defendants are entitled to qualified immunity from Medrano's failure to render medical aid claim.

### A.   Excessive Force

For Medrano's excessive force claim, the court begins with the second prong of the qualified immunity analysis—whether the constitutional right at issue was clearly established at the time of the defendant's conduct.  *See Hernandez ex rel. Hernandez*, 657 F.3d at 473.  Medrano contends both that Crew's use of tear gas to extract him from the structure constituted excessive force and that the amount of tear gas used was excessive.

To assess whether police used excessive force in violation of the Fourth Amendment, courts ask "whether the officers' actions [were] objectively reasonable in light of the totality of the circumstances."  *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  In applying this standard, courts are "mindful that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *Flournoy v. City of Chicago*, 829 F.3d 869, 874 (7th Cir. 2016) (quoting *Graham*, 490 U.S. at 396–97).

In *Estate of Escobedo*, the Seventh Circuit surveyed cases from all circuits and found the following:

> [T]he clearly established law as of July 19, 2005, established that the use of tear gas is unreasonable when: (1) attempting to subdue individuals as opposed to mass crowds; (2) when the individual does not pose an actual threat; (3) when the individual is not holding hostages; (4) when the individual has

> not committed a crime and the officers are not in the process of attempting to make an arrest; (5) when the individual is armed but merely suicidal as opposed to homicidal; (6) when the individual is not attempting to evade arrest or flee from the police; and (7) when the individual is incapacitated in some form.

600 F.3d at 783.  Medrano does not cite any subsequent cases, nor could the court find any, that have found tear gas unreasonable in any additional circumstances not identified by the Seventh Circuit in *Estate of Escobedo*.

The facts of this case distinguish it from those instances in which it was clearly established that the use of tear gas was unreasonable.  In *Estate of Escobedo*, the court concluded that it was clearly established law that the use of tear gas was unreasonable "when the individual is not attempting to evade arrest or flee from the police."  600 F.3d at 783.  In reaching this conclusion, the court considered the Sixth Circuit's analysis in *Greene v. Barber*, 310 F.3d 889 (6th Cir. 2002). There, the Sixth Circuit held that the use of pepper spray may have constituted excessive force where an individual was being arrested for a low-level crime, was not threatening anyone's safety, and was not attempting to evade arrest by flight, even though he was actively resisting arrest and refused to be handcuffed.  *Greene*, 310 F.3d at 898.  Medrano however was actively evading arrest.  There was a warrant out for Medrano's arrest in Iowa when he fled by vehicle from police at a motel in Washington, Indiana.  (Washington Police Report at 13; Medrano Warrants at 3; SRU After Action Report at 9).  He had not turned himself into the police by the time they tracked him down at 600 Front Street.

11

The Seventh Circuit also concluded that it was clearly established law that the use of tear gas was unreasonable "when the individual is incapacitated in some form." *Est. of Escobedo*, 600 F.3d at 783. The Seventh Circuit took the word "incapacitated" from the Sixth Circuit's decision in *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994). In *Adams*, after the plaintiff started to walk away from a third party's car and did not heed the officer's order to stop, the officer sprayed mace in the plaintiff's face. 31 F.3d at 378. The plaintiff then retreated to the car, and construing inferences in favor of the plaintiff, the court inferred that the plaintiff would have been blinded and incapacitated from the first instance of mace. *Id.* at 385. Yet, according to some witnesses, the officer sprayed the plaintiff with mace again, which would constitute excessive force if plaintiff was already blinded and incapacitated. *Id.* at 385–86. Thus, it was clearly established that tear gas was unreasonable where an individual was incapacitated in the sense that they had already been subdued by chemical agents. *See Est. of Escobedo*, 600 F.3d at 783; *cf. Est. of Escobedo v. Martin*, 702 F.3d 388, 406 (7th Cir. 2012) (discussing testimony that "tear gas is 'incapacitating' when an individual can no longer remain inside a structure" and that "an 'incapacitating' amount of tear gas means an amount sufficient to make the suspect feel uncomfortable but not render him unconscious").

Medrano was not incapacitated in the sense contemplated by the Seventh Circuit when it laid out the clearly established law. The evidence shows that Medrano may have been asleep. He testified that he was asleep when the police arrived and while they made loudspeaker announcements for him to exit the residence because he passed out after taking Suboxone. (Medrano Dep. at 11–13). And Godfrey told Holcomb that Medrano

kept falling asleep and had Suboxone. (Holcomb Bodycam at 23:25). Construing the facts in the light most favorable to Medrano, he was passed out after ingesting Suboxone. But being asleep, even if it may be a more serious unconsciousness due to the ingestion of a drug, does not fall within the meaning of incapacitation where it is clearly established that use of tear gas violates the Constitution.

The Seventh Circuit also concluded that it is clearly established that the use of tear gas is unreasonable "when the individual does not pose an actual threat." *Est. of Escobedo*, 600 F.3d at 783. Medrano has demonstrated that there is an issue of fact as to whether officers could reasonably believe that he was armed in the house, and thus posed an actual threat, but that issue of fact is immaterial. Even if officers could not have reasonably believed that Medrano posed an actual threat, there is no closely analogous case putting Crew on notice that deploying tear gas to extract Medrano from the residence would be unreasonable given that he was evading arrest and had fled from police.

In cases where the use of tear gas was unreasonable because the individual posed no actual threat, the individual was not evading arrest or fleeing from police. *See Greene*, 310 F.3d at 898 (finding use of pepper spray could be excessive force where plaintiff was being arrested for a low-level disturbance in a public place, was not threatening anyone's safety, and was not attempting to evade arrest by flight); *Est. of Escobedo*, 600 F.3d at 783 (holding that officers were on notice that their use of tear gas could be unreasonable where suicidal individual not under arrest posed no threat to anyone but himself); *Lock v. Jenkins*, 641 F.2d 488, 496 (7th Cir. 1981) (concluding that use of tear gas against

13

individual with a food tray, which constituted a "potential weapon," was unconstitutional because no evidence demonstrated how the tray could be used as a weapon while the individual was locked in his prison cell).  And given that Medrano was evading arrest, Medrano has not established that Crew's conduct was "patently violative of the constitutional right" such that he would know his conduct violated the Fourth Amendment absent a closely analogous case.  *Est. of Escobedo*, 600 F.3d at 780.  In sum, Crew did not violate clearly established law when using tear gas to extract Medrano from the house.[3]

Medrano raises two additional arguments to resist this conclusion.  First, he argues that there was no search warrant for 600 Front Street when the officers began making plans to use tear gas, deployed the robot to gain entry into the residence, or shot the sponge round through the front door.  Search warrants are meant to prevent unreasonable searches and seizures that "invade . . . property and privacy," *United States v. Stefonek*,

---

[3] The parties spend considerable time in the briefing arguing over whether there is a genuine issue of fact as to whether Medrano was barricading himself in the residence.  Construing the facts in the light most favorable to Medrano, Medrano was asleep and could not physically barricade himself.  However, Crew is entitled to qualified immunity for the reasons discussed.

179 F.3d 1030, 1033 (7th Cir. 1999), not excessive force, which is Medrano's claim.[4]

Even if the officers' actions before procuring a search warrant did constitute an

unreasonable search, that cannot convert Medrano's excessive force claim into a

successful one. *See County of Los Angeles v. Mendez*, 581 U.S. 420, 429 n.* (2017)

("[*O*]*nce* a use of force is deemed reasonable under *Graham*, it may not be found

unreasonable by reference to some separate constitutional violation.").

      Medrano also contends that the officers violated various Daviess County Sheriff's

Department policies, such as the tear gas, de-escalation, and deadly force policies.

However, § 1983 "protects plaintiffs from constitutional violations, not violations of . . .

departmental regulations and police practices." *Scott v. Edinburg*, 346 F.3d 752, 760 (7th

Cir. 2003). As such, "police training policies and best practices, while relevant, do not

define what is reasonable under the Fourth Amendment." *Turner v. City of Champaign*,

979 F.3d 563, 568 (7th Cir. 2020) (citing *United States v. Brown*, 871 F.3d 532, 536–37

(7th Cir. 2017)). *But see Est. of Biegert ex rel. Biegert v. Molitor*, 968 F.3d 693, 699 (7th

Cir. 2020) ("[P]olicies and procedures do not shed light on the reasonableness of an

---

[4] In its screening order, the court did not construe Medrano's complaint as asserting a Fourth Amendment claim for unreasonable search or seizure. (Filing No. 19). In any event, Medrano could not bring a claim for an unreasonable search of 600 Front Street because he does not reside there. *United States v. Jackson*, 576 F.3d 465, 467 (7th Cir. 2009) (rejecting plaintiff's argument that police needed a search warrant in addition to an arrest warrant to arrest him in a third party's apartment). If anyone, it would be the residents of 600 Front Street who could bring this claim. *See Steagald v. United States*, 451 U.S. 204, 213, 216 (1981) (holding that entry into a third party's home to arrest a suspect violated the third party's Fourth Amendment rights where officers possessed only an arrest warrant for the suspect and not a search warrant for the third party's home); *Jackson*, 576 F.3d at 468 ("[I]f officers enter a third party's residence in order to effect an arrest, the third party herself may have a Fourth Amendment claim against the officers.").

officer's behavior because, 'even if they could be practicably assessed by a judge, [such policies] vary from place to place and from time to time,' and so '[w]e cannot accept that'" constitutional protections "'are so variable.'" (alterations in original) (quoting *Whren v. United States*, 517 U.S. 806, 815 (1996))).  The court does not consider Medrano's arguments that Defendants violated Daviess County Sheriff's Department policies because, even if Defendants had violated the policies, it would not change the court's conclusion that the unreasonableness of Defendants' conduct was not clearly established.[5]

The amount of tear gas deployed does not change the court's conclusion.  In *Estate of Escobedo*, the court factored the amount of tear gas in its finding that defendants were not entitled to qualified immunity where officers deployed "twelve times the incapacitating concentration of tear gas," and plaintiff's expert witness testified "that amount 'was clearly and obviously excessive.'"  600 F.3d at 776, 783.  In contrast, here the Defendants' expert witness, Dr. Taylor, opined that "[t]he amount of force used was

---

[5] This conclusion applies equally to Medrano's arguments that Defendants violated departmental policies regarding the duty to intercede and report and medical considerations, which he raises with respect to his other claims.  As to the medical considerations policy, a violation of that policy would not alter the court's conclusion that Defendants did not act unreasonably in the provision of medical care to Medrano, discussed below.

consistent with nationally accepted standards."[6]  (Taylor Report at 8).  Medrano offers no

expert testimony or other evidence that the amount of tear gas used was more than the

incapacitating amount or otherwise excessive.  Medrano points out that officers outside

the house were affected by the tear gas, coughing and backing away from the house.

(*E.g.*, Humphries Bodycam at 1:20:10; Christie Bodycam at 1:15:00).  Unlike in *Estate of*

*Escobedo*, however, where the court noted than an officer had to leave his station outside

the apartment because the gas emanating from the apartment was so strong, and then

officers proceeded to use *more* tear gas, the officers here did not deploy any more tear

gas after they began experiencing the effects.

In conclusion, Crew is entitled to qualified immunity from Medrano's excessive

force claim because it was not clearly established that his conduct was unlawful.

**B.     Failure to Intervene**

In this court's screening order, the court construed Medrano's complaint as

---

[6] Medrano argues that, if Dr. Taylor "really reviewed the materials provided for his expert opinion he would've clearly known . . . theres [sic] no evidence to support his expert opinion of the plaintiff ever have been armed . . . nor is there any evidence to support Dr. Taylors [sic] findings or law enforcements [sic] that the plaintiffs ever even barricaded himself."  (Pl.'s Mot. for Summ. J. at 27).  However, Medrano only argues that Dr. Taylor reached the wrong conclusions, not that he was unqualified or that his methodology was flawed, as he must.  *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 594–95 (1993) ("Rule 702['s] . . . overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission.  The focus, of course, must be solely on principles and methodology, not on conclusions that they generate.");  *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999))).  Because Medrano has not challenged Dr. Taylor's qualifications or his methodology and the court is satisfied that Dr. Taylor's testimony meets the requirements of Federal Rule of Evidence 702, the court does not exclude Dr. Taylor's opinion.

asserting a claim against Hinderliter, Garland, Waggoner, Dietch, Guzman, and

Holcomb[7] for failing to intervene when Crew deployed an excessive amount of tear gas.[8]

(Screening Order at 5).  "[T]he fate of [Medrano's] failure to intervene claim is closely

linked to that of [his] excessive force claim, since, by definition, if there was no excessive

force then there can be no failure to intervene."  *Abdullahi v. City of Madison*, 423 F.3d

763, 767–68 (7th Cir. 2005).

The court previously concluded that Crew is entitled to qualified immunity from

Medrano's excessive force claim because it was not clearly established that his

deployment of tear gas to extract Medrano from the residence violated the Fourth

Amendment.  Because it was not clearly established that Crew's actions constituted

---

[7] "Qualified immunity is an individual defense available to each individual defendant in his individual capacity."  *Est. of Williams v. Cline*, 902 F.3d 643, 651 (7th Cir. 2018) (quoting *Bakalis v. Golembeski*, 35 F.3d 318, 326–27 (7th Cir. 1994)).  The parties consider the officers' defenses together.  Because "the facts relative to the alleged constitutional violation[s]" do not "differ from defendant to defendant," the court will do the same.  *Id.*; *see Est. of Green v. City of Indianapolis*, 420 F. Supp. 3d 816, 824 n.1 (S.D. Ind. 2019).

[8] In Medrano's motion, he asserts other failure to intervene claims that were not pled in his complaint: that Garland, Holcomb, Dietch, Waggoner, and Hinderliter failed to intervene when Crew discharged a 40mm sponge round at the front door without a warrant, that Defendants failed to intervene when Garland authorized the use of a robot to make entry into the residence without a warrant and used an old warrant to make entry into the residence, and that Defendants failed to intervene in the insufficient provision of medical care.  (Pl.'s Mot. for Summ. J. at 41–43).  The court declines to allow Medrano to constructively amend his complaint through summary judgment briefing to assert new claims.  *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 489 (7th Cir. 2023) (stating that raising a new claim on summary judgment is "generally impermissible").  Allowing Medrano to constructively amend his complaint to assert these claims would be futile, given the court's finding that Defendants are entitled to qualified immunity on his failure to render medical aid claim, as discussed below, and that Medrano is not able to bring a claim for unreasonable search or seizure of a third party's residence, as discussed above in footnote four.  *See id.* at 490 ("If the district court" treats new claims presented for the first time in briefing as a constructive motion to amend, "it should apply the familiar standards governing when leave to amend should be granted . . . .");  *Forman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that "futility of amendment" is a justification for denying leave to amend).

excessive force, it necessarily follows that the other officers could not be on fair notice that failure to intervene would violate Medrano's Fourth Amendment rights.  *See Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015) ("Here, because it was not clearly established that McCallum's actions constituted excessive force, a reasonable officer was not on fair notice that his failure to intervene when McCallum deployed the Taser violated Hollingsworth's Fourth Amendment rights."); *Martinez v. City of New York*, 564 F. Supp. 3d 88, 106–07 (E.D.N.Y. 2021) (explaining that a "failure to intervene claim is contingent upon the disposition of the [underlying] primary claims" and that therefore where "summary judgment is appropriate for the defendants on those underlying claims, summary judgment is also appropriate on the failure to intervene claims predicated upon them" (alteration in original)); *cf. Abdullahi*, 423 F.3d at 767–68; *Leaf v. Shelnutt*, 400 F.3d 1070, 1093 (7th Cir. 2005) ("Because we have determined that the officers' actions inside the apartment constituted neither an illegal search nor an illegal seizure, we must conclude that [plaintiffs] do not have a cognizable claim . . . for failing to intervene . . . .").  As such, Hinderliter, Garland, Waggoner, Dietch, Guzman, and Holcomb are entitled to qualified immunity from Medrano's failure to intervene claim.

### C.    Failure to Render Medical Aid

For Medrano's failure to render medical aid claim, the court begins with the first prong of the qualified immunity analysis—whether Defendants violated a constitutional right.  *See Hernandez ex rel. Hernandez*, 657 F.3d at 473.

19

Claims for failure to render medical aid arising from events that took place while a plaintiff was under arrest and prior to a probable cause hearing are brought under the Fourth Amendment. *Braun v. Village of Palatine*, 56 F.4th 542, 551 (7th Cir. 2022). As such, the inquiry is whether the "officer's conduct was objectively unreasonable under the circumstances." *Id.* (internal quotation marks omitted). The court considers "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011).

In *Braun*, the Seventh Circuit affirmed summary judgment for defendants on a plaintiff's claim for failure to render medical aid. 56 F.4th at 545. In that case, Braun got into a car accident after suffering a seizure while driving, but he did not remember the seizure. *Id.* The officer who first responded to the scene suspected that he was intoxicated—due to his slurred speech, bloodshot and glassy eyes, difficulty balancing, and bizarre statement that he lived in "Chicago-Miami"—and arrested him. *Id.* Braun argued that the defendant officer "deprived him of his right to medical care by dismissing the ambulance from the scene of the accident." *Id.* at 551. The court held that the officer lacked notice of Braun's medical needs because he told officers that he was "fine" and answered "no" when asked if he was injured, needed medical care, or suffered from a medical condition. *Id.* Nothing the defendant observed undermined those statements, including his physical symptoms—confusion, slurred speech, bloodshot eyes, and

20

difficulty balancing—and his statement that he lived in "Chicago-Miami," because they were consistent with intoxication. *Id.* at 551–52.

The facts of this case are sufficiently similar to those in *Braun*. After Medrano exited the house, he was hosed down. (Garland Bodycam at 1:23:29). An officer provided Medrano with water to drink a few times until Medrano indicated he did not need more water. (*Id.* at 1:26:05–1:29:48). Hudson asked Medrano if he was alright, to which Medrano responded "yeah." (Hudson Bodycam at 5:35). Garland asked Medrano if he was hurt, and Medrano said, "I'm good, man." (Garland Bodycam at 1:25:14). When Garland asked Medrano whether the tear gas had cleared out of his system, Medrano responded, "Oh yeah." (*Id.* at 1:29:50). Medrano confirmed as much in his deposition. (Medrano Dep. at 52 ("Q: At every point when officers asked you how you were doing, you told them that you were good or some version of that; correct? A: According to the video, the body cam, that's correct.")).

Medrano contends that Defendants should have known he needed medical care, regardless of his statements, because his eyes were "blood shot red" and puffy, and his face was swollen. (Pl.'s Mot. for Summ. J. at 45–46; Medrano Dep. at 45–46, 48). However, Medrano acknowledged in his deposition that puffy eyes are a side effect of tear gas that recedes. (Medrano Dep. at 47). Just as the *Braun* plaintiff's visible physical symptoms that were consistent with the officer's suspicion of intoxication did not put officers on notice of the platiniff's need for medical care, Medrano's visible swelling consistent with side effects of tear gas that recede did not put Defendants on notice of a need for additional medical care.

21

As to the second factor, the seriousness of the medical need, Medrano has not submitted evidence or testified that any doctors have confirmed he has suffered serious or permanent injury from tear gas exposure. (*See* Medrano Dep. at 55, 66). Although he had x-rays taken of his lungs to assess whether he had scar tissue from the tear gas, U.S. Marshals never approved him to see a specialist that could interpret the x-rays. (*Id.* at 52, 54–55). Medrano had a "tic" and problems with his eyesight that he "might have obtained" from exposure to tear gas, but the doctor he saw told him they were just side effects of the tear gas and that they should go away. (*Id.* at 66–67).

Medrano's claim also falters with respect to the third factor—the scope of requested treatment. As noted, Medrano did not request any medical care from Defendants. (*See* Medrano Dep. at 52 ("Q: At no point during the video we just watched did you request medical assistance; correct?  A: That's correct.")). Defendants make no argument with respect to the fourth factor.

Medrano contends that the bodycam footage shows officers providing themselves with medical attention, which means officers should have provided him with more medical attention. (Pl.'s Mot. for Summ. J. at 46). However, the bodycam footage only shows officers drinking water or Gatorade and pouring water on themselves. (*See, e.g.*, Humphries Bodycam at 1:23:25; Garland Bodycam at 1:26:05, 1:27:20). Medrano received the same care when he was hosed off and provided water. (Garland Bodycam at 1:23:29, 1:26:05–1:29:48). The officers' actions do not support Medrano's claim.

In conclusion, Medrano failed to raise a genuine issue of material fact that Defendants violated his Fourth Amendment right to medical aid because they lacked

notice of any need for medical care, there is no evidence that any need for care was serious, and Medrano never requested medical treatment. Defendants are entitled to qualified immunity as a matter of law.

## IV.      Conclusion

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Filing No. 109) is **GRANTED**. Medrano's Cross-Motion for Summary Judgment (Filing No. 114) is **DENIED**. Final judgment shall follow by separate order.

**IT IS SO ORDERED** this 29th day of March 2024.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distribution:

All ECF-registered counsel of record via email

Elvis Cesar Medrano
17734-028
Federal Correctional Institution, Berlin
P.O. Box 9000
Berlin, New Hampshire 03570